UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                           :

**ANTHONY BROWN**,
                           :

               Petitioner,
                           :    **MEMORANDUM DECISION AND**
      – against –              :    **ORDER**
                           :

**UNITED STATES OF AMERICA**,
                           :    20-CV-1509 (AMD)
                           :    16-CR-297-2 (AMD)
              Respondent.     :
-------------------------------------------------------------- X

**ANN M. DONNELLY,** United States District Judge:

      Anthony Brown, proceeding *pro se*,[1] moves to vacate, set aside or correct his sentence

pursuant to 28 U.S.C. § 2255.  On April 18, 2017, the petitioner pled guilty to the following

crimes: (1) conspiracy to distribute and possess with intent to distribute at least 500 grams of

cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B) (*United States v. Belardo et al.*, 16-

CR-297 (E.D.N.Y. 2016)); (2) aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1)

(*United States v. Anthony Brown*, 17-CR-194 (E.D.N.Y. 2017)); and (3) conspiracy to distribute

and possess with intent to distribute cocaine and heroin in violation of 21 U.S.C. §§ 846 and

841(b)(1)(C) (*United States v. Anthony Brown*, 17-CR-192 (E.D.N.Y. 2017)).[2]  On October 11,

2017, I sentenced the petitioner to 192 months' imprisonment—concurrent 168-month terms on

the drug charges and a mandatory consecutive 24-month term on the identity theft charge, with

four years of supervised release.  The Second Circuit affirmed the sentence on May 15, 2019.

The petitioner moves to vacate, set aside, or correct his sentence, claiming that his lawyers were

---

[1] The petitioner was represented by counsel in the proceedings before this Court and on appeal.

[2] This case was transferred from the District of Maine, *United States v. Anthony Brown*, 16-CR-170 (D. Me.), to the Eastern District of New York, with the consent of the petitioner.

ineffective and that his sentence is unconstitutional.[3]  (ECF No. 366.)  He also moves to appoint

CJA counsel to assist with his habeas petition.  (ECF No. 414.)  For the reasons that follow, the

petition is dismissed without prejudice and with leave to amend, and the petitioner's motion to

appoint counsel is granted.

## BACKGROUND

### I.       The Petitioner's Criminal Conduct

#### a.       New York Drug Charge

In June 2016, following a six-month investigation by the Federal Bureau of Investigation

and the New York Police Department, a grand jury indicted the petitioner and nine associates for

conspiracy to possess and distribute cocaine and "crack" cocaine in the Cypress Hills

neighborhood of Brooklyn.  (ECF No. 1.)  The indictment alleged that from December of 2015

through May of 2016, the defendants "knowingly and intentionally conspire[d]" to possess and

distribute controlled substances including more than 500 grams of cocaine and 280 grams of a

substance containing cocaine base.  (*Id.* ¶ 1.)  The investigation established that the petitioner

was a "major cocaine supplier" in the Cypress Hills Houses.  (ECF No. 221 at 3.)

#### b.       Maine Drug Charge

In 2016, the petitioner was charged with distributing and possessing with intent to

distribute cocaine and heroin.  (ECF No. 367 at 2.)  That case was transferred to this Court for

disposition and sentencing.

#### c.       Identity Theft Charge

During the investigation, agents learned that the petitioner rented an apartment in

Williamsburg, Brooklyn, using someone else's name.  (ECF No. 221 at 3.)  On June 7, 2016,

---

[3] Although the clerk's office opened a civil case (20-CV-1509) for the petitioner's habeas petition, the petition and all responsive documents were filed on the criminal docket (16-CR-297).

federal agents searched the apartment and found over 100 glassine envelopes of heroin, as well as drug paraphernalia and ammunition.  The agents also seized two computers with forgery imaging software, 42 drivers' licenses with other people's photographs and names, 139 bank and gifts cards with other people's names and 135 Postal Service money orders.  (ECF No. 367 at 3; ECF No. 221 at 3.)  Additionally, in conversations captured on a court-authorized wiretap, the petitioner described his fraudulent activities, including stealing gift cards and selling apparently stolen iPhones and late-model Samsung cell phones.  (ECF No. 221 at 4; ECF No. 367 at 2.)

## II.    The Petitioner's Guilty Plea

On April 18, 2017, the petitioner, represented by Kenneth Montgomery, pled guilty, pursuant to a plea agreement, to conspiring to distribute and possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(ii)(II), aggravated identity theft, in violation of 18 U.S.C. § 1028(A), and conspiring to distribute and possess with intent to distribute substances containing cocaine and heroin, in violation of 21 U.S.C. § 846. (ECF No. 221 at 2-3; ECF No. 367-1, A-22.)  As part of the agreement, the petitioner stipulated to additional conduct related to the contraband seized from the Williamsburg apartment, which he agreed would be treated as additional crimes of conviction under the sentencing guidelines. (ECF No. 367 at 3-4.)  The plea agreement estimated an adjusted offense level of 26 and a criminal history category of III, with an estimated sentence range of 102-121 months' imprisonment.  (*Id.* at 4.)

In addition, the plea agreement provided that "[i]f the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement." (ECF No. 367-1, A-22 ¶ 4.)  During his plea, the petitioner confirmed that he had discussed the

3

agreement with his attorney, and that he understood that he was waiving all the rights associated

with a trial.  (April 18, 2017 Plea Hr'g Tr. at 15-16.)  He also confirmed his understanding that

the applicable guideline range would not be determined conclusively until after the Court

received the pre-sentence report, and that his sentence might be different from what he hoped or

expected.  (*Id.* at 19-20.)  He understood that the sentence range estimate in the plea agreement

"could be wrong," that there was "no guarantee" that he would get a "particular guideline range

or a particular guideline sentence," and that "[i]f the advisory guideline range that's in the

presentence report is different from what [he] expect[ed], [he would] not [] be able to take [his]

plea back."  (*Id.* at 23.)

III.    **Sentencing**

On July 31, 2017, the Probation Department filed a Presentence Investigation Report

("PSR") in which it determined that the offense level was 31, and that the petitioner's criminal

history category was VI.  (ECF No. 153 ¶ 140.)  The PSR also detailed the petitioner's criminal

history, including a 2001 conviction for criminal sale of a controlled substance in the third

degree in violation of New York Penal Law § 220.39(1), which was a predicate offense for

career offender purposes.  (*Id.* ¶ 95.)  The PSR included the petitioner's 2002 conviction for

assault in the second degree in violation of New York Penal Law § 120.05(2) but did not specify

whether this conviction was a predicate offense for career offender purposes.  (*Id.* ¶ 96.)

Probation concluded that the petitioner was a career offender with a criminal history category of

VI.  (*Id.* ¶¶ 96, 102.)  As a result, the Probation Department calculated the petitioner's guideline

range as 188 to 235 months; with the one-level adjustment for global plea reduction, the

guideline range was 168 to 210 months.  (*Id.* ¶¶ 140, 158.)

In a written sentencing recommendation, the Probation Department recommended

concurrent sentences of 168 months' custody on the drugs charges, and a statutorily mandated

consecutive sentence of two years on the identity theft charge. (ECF No. 153-1 at 4.) The Probation Department deemed the petitioner to be a career offender "[d]ue to the nature of the instant drug offenses and [the petitioner'] prior drug sale and assault felony convictions." (*Id.* at 3.)

The petitioner's attorney filed a sentencing memorandum in which he advocated for a "sentence at variance with the Guidelines," because the petitioner's criminal history score "overstate[d] the seriousness of his criminal history." (ECF No. 215 at 3.) Counsel also argued that adopting Probation's sentence recommendation would result in an unwarranted disparity between the petitioner and his co-defendants who engaged in "similar or more involved conduct." (*Id.*)

The government urged the Court to impose a sentence within the Guidelines range of 192 to 234 months. (ECF No. 221 at 1.) The government cited the seriousness of the charges: "by trafficking [the] deadly drugs to Maine, the defendant [] impacted another community that [was] ravaged by drug addiction." (*Id.* at 7.) In addition, the government argued that the identity theft "affected the credit of innocent working people across the country," including one victim who could not "buy a home because of unexplained credit issues caused by the defendant." (*Id.* at 6-8.) Citing the petitioner's extensive criminal history, which included "parole violations, a shooting, repeated narcotic offenses in Brooklyn and Maine, abscondsions, and violations committed while incarcerated," the government argued that the petitioner's career offender status was "well deserved," and that Section 3553(a) factors did not warrant a downward variance. (*Id.* at 11.)

The government acknowledged that the plea agreement misstated the petitioner's criminal history category as level III, rather than level VI (*id.* at 4), explaining that the

5

calculation was based on a criminal history report that did not include the petitioner's conviction for criminal sale of a controlled substance in the third degree, which was one of the crimes that made him a career offender. (*Id.* at 5 & n.5.) The government also pointed to the provision in the plea agreement that allowed the government to seek a sentence above the 102-to-121-month range in the plea agreement. (*Id.*)

At sentencing on October 11, 2017, Mr. Montgomery urged the Court to impose a below-guidelines sentence, pointing out that the petitioner believed when he pled guilty that he faced at most a sentence of 121 months' imprisonment; it was only after Probation calculated his criminal history—the majority of which included crimes that the petitioner committed as a younger man—that he faced a much longer sentence. (October 11, 2017 Sentencing Tr. at 17-18.)

After doing the Guidelines calculation, I considered the § 3553 factors: the need that the sentence reflect the seriousness of the crime, that the sentence be a just punishment, that it serve both specific and general deterrence, and that the public be protected. In this regard, the petitioner led a sophisticated and wide-ranging narcotics enterprise, both here and in Maine, as well as an identity theft ring. (*Id.* at 28-32.) I also considered the petitioner's criminal history, and his fugitive status. I sentenced the petitioner to a total of 192 months' imprisonment and four years of supervised release. (*Id.*)

## IV.    Second Circuit Appeal

Robert Boyle represented the petitioner on appeal. (*United States v. Anthony Brown*, No. 17-3350 (2d Cir. 2017) ("Appeal Dkt."), ECF No. 77.)[4] Mr. Boyle argued that the Court's determination that the petitioner was a career offender was plain error, and that the sentence was

---

[4] After the petitioner filed a notice of appeal in the Second Circuit Court of Appeals, on October 20, 2017 (ECF No. 230), Mr. Montgomery moved to withdraw as counsel and asked the Second Circuit to appoint appellate counsel. (Appeal Dkt., ECF No. 68.) The Second Circuit appointed Mr. Boyle as CJA counsel.

"substantively unreasonable."  (Appeal Dkt., ECF No. 129 at 20.)  First, counsel argued that the petitioner was not a career offender because the 2001 conviction for criminal sale of a controlled substance in the third degree was the only "controlled substance offense" (*id.* at 17-19), and the plaintiff's July 2022 second-degree assault conviction was not a "crime of violence."  (*Id.* at 20-25.)  Additionally, he argued that the Court should not have relied exclusively on the PSR, because it referred to "non-*Shepard*" documents.[5]  (*Id.* at 23-24.)  Counsel also pointed out that the petitioner's criminal history was based on convictions from his youth.  Finally, counsel argued that the petitioner's sentence was longer than the sentences imposed on his similarly situated co-defendants.  (*Id.* at 27-28.)

In his *pro se* brief, the petitioner argued that Probation's conclusion that he was a career offender was based on the criminal sale of a controlled substance in the third-degree conviction, which was not a "controlled substance offense" covered by the Controlled Substances Act.  (Appeal Dkt., ECF No. 175 at 1-2.)

On May 16, 2019, the Second Circuit affirmed the petitioner's sentence.  Reviewing the career offender determination for plain error because the petitioner did not object at sentencing (ECF No. 354 at 3-4), the court found that the petitioner's assault conviction "categorically constituted a crime of violence," (*id.* at 4 (internal quotations omitted)), that the Court did not commit plain error by relying on the PSR to conclude that the petitioner was convicted of

---

[5] In *Shepard v. United States*, 544 U.S. 13 (2005), the Supreme Court held that a sentencing court considering a defendant's prior convictions is "generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."  *Id.* at 16.  Probation noted in the PSR that the criminal complaint, indictment, and local presentence report pertaining to the petitioner's second-degree assault charge were requested but "no responses [were] received."  (ECF No. 153 ¶ 96.)  Mr. Boyle argued that the Court should not have relied on the PSR, because Probation did not specify whether it based its conclusions on *Shepard* documents and cited an NYPD arrest report rather than an official court record, and that this Court plainly erred when it considered non-*Shepard* documents.  (Appeal Dkt., ECF No. 129 at 21-24.)

second-degree assault, and that the assault conviction was a crime of violence.  (*Id.* at 5.)  The Second Circuit also concluded that the sentence was not substantively unreasonable, because it was not "shockingly high or otherwise unsupportable as a matter of law."  (*Id.* at 6-7 (citation omitted).)  Finally, addressing the petitioner's *pro se* argument, the Court rejected the petitioner's claim that his state court narcotics conviction was not a "controlled substance offense."  (*Id.* at 6.)

## V.    The Petition

When he pled guilty, the petitioner confirmed that he was "fully satisfied with Mr. Montgomery's representation and the advice that he [had] given [him] on all three of [the] cases."  (Plea H'rg Tr. at 9.)  Now, however, the petitioner claims that Mr. Montgomery, an able and experienced advocate, was ineffective.  The petitioner claims that counsel should have objected to the career offender determination, that counsel assured him that his sentence would not be more than 121 months, and that counsel did not investigate the petitioner's criminal record before the plea.  The petitioner also claims that Mr. Montgomery did not explain the elements of the crimes to which the petitioner was pleading, including that "scienter" was an element of aggravated identity theft.

The petitioner also faults his appellate lawyer's performance.  According to the petitioner, Mr. Boyle had a "duty . . . to challenge the career offender designation" but "failed to do so" (ECF No. 366 at 18); in the petitioner's view, if appellate counsel had "conducted even a scintilla of research on the New York assault he would have discovered it did not require causation by use of physical force."  (*Id.* at 23 (capitalization altered).)

## LEGAL STANDARD

Federal law permits a "prisoner in custody under sentence of a court" to "move the court which imposed the sentence to vacate, set aside or correct the sentence" on the "ground that the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). The sentencing court must "vacate and set the judgment aside" if it finds that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." § 2255(b). In ruling on a § 2255 motion, the Court construes a *pro se* petitioner's submissions liberally and interprets them "to raise the strongest arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citations omitted).

A petitioner cannot succeed on a claim that he did not raise on direct appeal, *Reed v. Farley*, 512 U.S. 339, 354 (1994), unless the claim is for ineffective assistance of counsel, or the petitioner "establishes either (1) cause for the failure to bring a direct appeal and actual prejudice from the alleged violations; or (2) actual innocence." *United States v. Sessa*, No. 92-CR-351, 2011 WL 256330, at *17 (E.D.N.Y. Jan. 25, 2011) (quoting *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007)), *aff'd*, 711 F.3d 316 (2d Cir. 2013). "An ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

The mandate rule "bars re-litigation of issues already decided on direct appeal," *Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010), including those for ineffective assistance of counsel, *Yick Man Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010) (quoting *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007). This rule applies to "issues expressly or impliedly decided by the appellate court." *Becker*, 502 F.3d at 127. "Applying this general principle, we

9

have held that section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.  Nevertheless, application of the doctrine remains a matter of discretion, not jurisdiction." *Id.* (quotations and citations omitted).  A court "may find it appropriate to reconsider an earlier decision when we are confronted with 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* (citation omitted).

## DISCUSSION

### I.      Ineffective Assistance of Counsel

The government argues that some of the petitioner's claims are barred by the mandate rule.  (ECF No. 367 at 13-14.)  Because the petitioner did not make an ineffectiveness of counsel argument on direct appeal, this claim is not barred.

The Sixth Amendment of the United States Constitution guarantees all criminal defendants the assistance of counsel; the "purpose of the Sixth Amendment guarantee of the Assistance of Counsel . . . is to ensure that defendants have effective assistance of counsel." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citations omitted).

"A defendant challenging his conviction and sentence on the basis of ineffective assistance of counsel bears a heavy burden." *United States v. Diaz*, 176 F.3d 52, 112 (2d Cir. 1999).  A petitioner claiming that his lawyer was ineffective must meet the two-pronged test enunciated in *Strickland v. Washington*: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. 668, 688, 694 (1984).

To satisfy the first prong, "[a] convicted defendant . . . must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "[A] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy." *Singleton v. Duncan*, No. 03-CV-561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) (citing *Jones v. Barnes*, 463 U.S. 745, 752 (1983)). Courts assessing whether counsel was ineffective "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, but "relief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy," *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (citation omitted).

The second prong of the *Strickland* test is satisfied only if the petitioner establishes that there is "a probability sufficient to undermine confidence in the outcome." *Id.* "The level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "In order to satisfy the prejudice prong with respect to a claim focusing on a plea of guilty, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

a.  **Trial Counsel**

The petitioner makes multiple complaints about Mr. Montgomery's representation—that he should have challenged the career offender determination and investigated the petitioner's criminal record before the plea.  The petitioner also says that Mr. Montgomery did not explain that "scienter" was an element of identity theft.

Even accepting the petitioner's claim that Mr. Montgomery did not sufficiently investigate the petitioner's criminal record, "[a] failure to investigate and challenge prior convictions does not, by itself, constitute ineffective assistance of counsel."  *Ennis v. Walker*, No. 00-CV-2875, 2001 WL 409530, at *17 (S.D.N.Y. Apr. 6, 2001).  The focus of the court's inquiry is "simply whether the facts of [the] case . . . would have alerted a reasonably competent attorney to the need to investigate" the prior conviction.  *Id.* (quoting *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir.1987)).  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information."  *Strickland*, 466 U.S. at 691.

Mr. Montgomery relied on an FBI-generated criminal history report of the petitioner's criminal record (ECF No. 367 at 8), the same report that the government had.  This was entirely reasonable, since nothing in the record raised questions about the accuracy of the report.  Moreover, the petitioner does not claim that he described the entirety of his criminal history to Mr. Montgomery or told him anything that should have prompted additional investigation.  Under these circumstances, there was no reason for Mr. Montgomery to think that the report was not accurate.

Similarly unpersuasive are the petitioner's claims that Mr. Montgomery was ineffective because he did not tell the petitioner about the career offender enhancement and that he told the petitioner his sentence would not exceed 121 months.  The petitioner claims that had he known that he faced a longer sentence, he "would have taken his chances with a jury."  (ECF No. 366 at 14.)

As an initial matter, the petitioner has not submitted any evidence to support his claim that Mr. Montgomery told him he would "receive no more than 121 months."  (ECF No. 366 at 5.)  In fact, during the allocution, the petitioner confirmed that no one promised he would be getting a particular sentence.  (Plea Hr'g Tr. at 25.)

Moreover, there is no support for the petitioner's claim that he would have gone to trial on the three separate indictments had he known that he could be sentenced as a career offender. "In the context of plea negotiations, a defendant can make [a showing of prejudice] by producing both a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for his counsel's deficient performance and also some additional 'objective evidence' supporting his claim." *United States v. Frederick*, 526 F. App'x. 91, 93 (2d Cir. 2013).  The petitioner does not support his claim with sworn testimony or statements.  His "self-serving, after-the-fact statement that he would not have pleaded guilty if advised of the inconsistency and sentence exposure is insufficient evidence to demonstrate prejudice." *See Nicholas v. Smith*, 329 F. App'x 313, 316 (2d Cir. 2009).

It seems especially unlikely that the petitioner would have elected to go to trial on all of the charges against him.  As the government pointed out at sentencing, it could have filed a Prior Felony Information, because of the petitioner's prior narcotics felony conviction.  If the government had done that, the petitioner would have faced a 20-year mandatory minimum

sentence on the drug charges and a mandatory consecutive two-year sentence on the aggravated

identity fraud count, and the Guidelines range would have been 384 months to life.  (Sentencing

Tr. at 22.)  Moreover, the petitioner explained his reasons for pleading guilty: "I knew I was

guilty, I pleaded guilty and I just want to move forward with my life."  (*Id.* at 26.)

The record also establishes the petitioner's awareness that there were no sentence

guarantees.  First, the plea agreement provided that the petitioner could not withdraw his plea

"[i]f the Guidelines offense level advocated by the Office, or determined by the Probation

Department or the Court, is, for any reason, including an error in the estimate, different from the

estimate."  (ECF No. 367-1, A-22 ¶ 4.)  Second, the Court advised the petitioner when he pled

guilty that the advisory guideline range could be "different from what [his] lawyer [] told [him],"

that the guidelines estimates could be wrong, that there was "no guarantee as to a particular

guideline range or a particular guideline sentence," and that if the guideline range in the PSR was

different from what he expected, he would not be able to take his plea back.  (Plea Hr'g Tr. at

19-20, 23.)

In addition, the petitioner acknowledged in the plea agreement (ECF No. 367-1 at 2-3)

and during sentencing that he faced the following maximum terms of imprisonment: 40 years on

the New York narcotics charge, two years for the identify theft, and 20 years on the Maine

narcotics charge.  (Plea Hr'g Tr. at 16-18.)  And, the government advised the petitioner during

plea negotiations that it intended to seek an above-guidelines sentence because of his long

criminal history.  Under these circumstances, the petitioner knew the potential sentences he faced

when he pled guilty.

The petitioner also maintains that "Mr. Montgomery . . . had a duty to challenge the

career offender designation," and that he "had a right to adequate notice [in the PSR] of what

14

convictions may have supported the career offender enhancement."  (ECF No. 366 at 18.)

Because the Second Circuit rejected the petitioner's claim that he was not a career offender (ECF

No. 354), this argument fails, and Mr. Montgomery could not have been ineffective for not

challenging the designation.  The petitioner's reliance on two Fourth Circuit decisions, *United

States v. Hodge*, 902 F.3d 420 (4th Cir. 2018), and *United States v. Benton*, 24 F.4th 314 (4th

Cir. 2022), is misplaced.  First, as discussed above, the Second Circuit rejected the petitioner's

challenge to the career offender determination, so the mandate rule bars his claim in this petition.

*See Yick Man Mui*, 614 F.3d at 53 (2d Cir. 2010).  Second, *Hodge* and *Benton* involved the

Armed Career Criminal Act, as well as an effort by the government to use, on collateral review,

different convictions to sustain the enhancement.  *Hodge*, 902 F.3d at 427-28; *Benton*, 24 F.4th

at 313-14.

Finally, the petitioner argues that Mr. Montgomery did not "discuss the elements of [the]

crimes" with him, that he "did not know that in order to be convicted of aggravated identity theft

a scienter requirement was in place," and that "he was unaware that [there] were actually people

attached to" the drivers' licenses he used in connection with the identity theft charge.  (ECF No.

366 at 2, 5, 13.)

The petitioner stipulated in the plea agreement that he "possessed . . . 42 driver[s']

licenses bearing the photographs and names of people other than the defendant . . . as well as 139

bank and gift cards."  (ECF No. 367-1, A-25 ¶ 2.)  At the plea, the petitioner acknowledged that

he discussed the case and the charges with Mr. Montgomery.  (Plea H'rg Tr. at 6, 8-11.)  And, of

course, the information and the indictments list the elements of the crimes with which the

petitioner was charged.  (*See* ECF No. 367-1, A-14–A-21.)  The Court also described the charges

and asked the petitioner if he had any questions about them; he did not.  (Plea H'rg Tr. at 11-12,

24.)  In his factual allocution, the petitioner described the conduct underlying each charge (*id.* at 26-30), including the identity theft charge: he admitted that he "possessed gift cards and credit cards that belonged to other people" and that he knew "that those people actually existed."  (*Id.* at 28.)  Finally, as explained above, the petitioner confirmed that he was "fully satisfied with Mr. Montgomery's representation and [] advice . . . on all three of [the cases]."  (Plea H'rg Tr. at 9.)

The petitioner's sworn statements at his plea allocution, which were "[s]olemn declarations in open court [that] carry a strong presumption of verity," *Blackledge v. Allison*, 431 U.S. 63, 74 (1977), contradict his current claims.  Indeed, "subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."  *Id.*  Accordingly, because the petitioner's own sworn statements contradict his claim that he was unaware of the elements of the crimes that he pled guilty to, this basis for ineffective assistance of counsel necessarily fails.[6]

### b.    Appellate Counsel

The petitioner also complains that his appellate lawyer was ineffective; the petitioner says counsel should have challenged the career offender determination, argued that the PSR did not identify the second predicate offense, and "researched" the extent to which physical force is an element of second-degree assault in New York state.

In fact, Mr. Boyle did raise these issues.  He argued that "the Presentence Report specifically identified only one conviction as a predicate" (ECF No. 367-1 at 18), that "assault in

---

[6] To the extent that the petitioner means to argue that the Court or the government did not apprise him of the nature of the charges against him in violation of Federal Rule of Criminal Procedure 11, that claim is procedurally barred because it should have been raised on direct appeal.  The petitioner has not established either cause for his failure to bring the claim or his actual innocence.  *Sessa*, 2011 WL 256330, at *17.

the second degree can be violated without the use of physical force" (*id.* at 22), and that the career offender determination was "erroneous."  (*Id.* at 17.)

In any event, this ineffective assistance claim merely repackages the arguments the petitioner made on direct appeal and is therefore barred by the mandate rule.  *United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997) ("A § 2255 motion may not relitigate issues that were raised and considered on direct appeal."); *see also Batista v. United States*, No. 14-CV-895, 2018 WL 1556880, at *11 (E.D.N.Y. Mar. 30, 2018) ("While a petitioner can assert ineffective assistance of counsel claims for the first time in a Section 2255 motion . . . the Court sees no reason to address the identical substantive arguments already considered and rejected by the Circuit simply because Petitioner now relabels them as ineffective assistance claims.").

## II.      Constitutional Claims

Finally, the petitioner argues that his sentence is unconstitutional because criminal sale of a controlled substance in the third-degree is not a "controlled substance offense," and the Court adopted the PSR without considering *Shepard* documents.  The mandate rule bars these claims because the Second Circuit considered and rejected them.  Accordingly, the petition for a writ of habeas corpus is dismissed without prejudice.

## III.     Motion to Amend and to Appoint Counsel

The petitioner filed a notice of supplemental authority and to appoint counsel, (ECF No. 414), and a second notice of supplemental authority on January 23, 2023 (ECF No. 433), to which the government responded on February 16, 2023.  (ECF No. 438.)

In his second notice of supplemental authority, the petitioner cites *United States v. Gibson*, 55 F.4th 153 (2d Cir. 2023) (per curiam).  (ECF No. 433.)  Gibson's criminal record included a 2002 felony conviction for third-degree attempted criminal sale of a controlled

substance in violation of New York Penal Law § 220.39(1).  55 F.4th at 156.  When Gibson was convicted in New York state court, New York's drug statute was consistent with the federal law, in that both criminalized the attempted sale of naloxegol.  *Id.* at 156-57.  When Gibson appeared for sentencing on the federal charge in 2020, however, the CSA schedules no longer included naloxegol.  *Id.* at 165-66.  The question before the Second Circuit was which version of the federal CSA schedules should be compared against New York's law in connection with the proposed career-offender enhancement—the CSA schedules in 2002, when Gibson committed the state offense, or when he was sentenced for the federal offense in 2020.  *Id.* at 159.  The Second Circuit concluded that "the district court properly rejected the government's contention that the relevant CSA schedules were those in effect in 2002."  *Id.* at 165.[7]  Since naloxegol was removed as a federally controlled substance in 2015, the federal law was categorically narrower than the state-law counterpart when Gibson was convicted and sentenced, so the career offender enhancement was inapplicable.  *Id.* at 166-67.

The government argues that the Second Circuit did not address whether the removal of naloxegol from the federal schedule rendered the New York drug schedule categorically broader than the federal schedule.  (ECF No. 438 at 2.)  Additionally, the government points out that the Second Circuit previously upheld the petitioner's conviction and affirmed his sentence based on the career offender enhancement.  (*Id.*)

The petitioner committed the federal crimes between 2015 and 2016 and was sentenced in 2017.  He committed the state crime that was the predicate offense—criminal sale of a controlled substance in the third degree—in 2002.  Thus, if *Gibson* had been decided when the

---

[7] While it was not clear that the "version of the CSA schedules on which the district court should focus is the version in effect on the date of the defendant's sentencing for his current offense rather than on the date on which he committed his current offense," the CSA schedules "were narrower than state law at both times."  *Id.* at 165-66.

Court sentenced the defendant in 2017, the Court would probably not have applied the career offender enhancement.

In rejecting the petitioner's challenge to the career offender enhancement, the Second Circuit compared the definition of "narcotic drug" in N.Y. Penal Law § 220.00(7)—including the relevant New York schedules at the time of the defendant's conviction—with the CSA schedules listed at 21 C.F.R. §§ 1308.11(b) and (c) and 1308.12(b) and (c) and found that "[b]ecause every substance that is criminalized by New York schedules I(b), I(c), II(b), and II(c) appears on the federal schedules, construing Brown's prior conviction as a 'controlled substance offense' for purposes of the Career Offender Guidelines does not run afoul of the rule announced in *Townsend*."  (ECF No. 354 at 6.)

The Second Circuit decided *Gibson* after it decided the defendant's appeal.  In *Gibson*, the Court noted that New York law, currently and in 2002, defines the term "narcotic drug" to include "[o]pium and opiate, and *any* salt, compound, *derivative*, or preparation of *opium or opiate*," as defined in the relevant schedule.  *Gibson*, 55 F.4th at 156 (emphases in original).[8]  In 2015, naloxegol was specifically removed from the relevant CSA schedule.  *Id.* at 163 (listing as controlled: "(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate *excluding . . . naloxegol*." (emphasis in original) (citation omitted).[9]

On direct appeal, the petitioner argued that his New York drug sale conviction was not a "controlled substance offense," (Appeal Dkt., ECF No. 158 at 2-4), but did not argue, as he does

---

[8] "[N]aloxegol . . . can be derived from opium alkaloids."  *Id.*

[9] Similarly, in *United States v. Swinton*, District Judge Elizabeth Wolford compared the CSA schedules at the time of the defendant's December 2017 sentencing with the New York drug schedules at the time of his previous 1999 conviction under § NYPL 220.39(1), and found that because found the "conviction under § NYPL 220.39(1) is categorically broader than a conviction under the CSA . . . Swinton's 1999 conviction for violating NYPL § 220.39(1) does not qualify as a controlled substance predicate offense under the career offender Guideline."  495 F. Supp. 3d 197, 205-06, 210 (W.D.N.Y. 2020).

now, that the removal of naloxegol from the federal schedule in 2015 rendered it categorically narrower than its state law counterpart.[10]

Since a *pro se* party's submissions are liberally construed, the Court construes the petitioner's January 2023 notice of supplemental authority as a motion to amend the Section 2255 petition. *See, e.g.*, *Savoca v. United States*, No. 07-CV-2524, 2013 WL 10054624, at *28 (S.D.N.Y. Aug. 8, 2013). A motion to amend a Section 2255 petition is analyzed under Federal Rule of Civil Procedure 15(a), (*Ching v. United States*, 298 F.3d 174, 180 (2d Cir. 2002) (citing *Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001)), which provides that "[t]he court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a), and a *pro se* plaintiff should be granted leave to amend if "a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and quotation marks omitted). This rule applies with special force to habeas petitions, since *pro se* habeas petitioners "ordinarily lack legal knowledge and resources." *Garcia v. Superintendent of Great Meadow Corr. Facility*, 841 F.3d 581, 583 (2d Cir. 2016).

The petitioner is granted leave to amend his petition to address whether *Gibson* requires the Court to reconsider whether it should have applied the career offender enhancement.

The petitioner also asks the Court to appoint counsel. While "there is no constitutional right to representation by counsel in habeas corpus proceedings," *Green v. Abrams*, 984 F.2d 41, 47 (2d Cir. 1993) (internal quotation marks and citations omitted), "a court may appoint counsel to a financially eligible habeas petitioner under the CJA when 'the interests of justice so require,'" *Hayon v. Reardon*, No. 20-CV-4668, 2021 WL 25365, at *7 (E.D.N.Y. Jan. 4, 2021)

---

[10] Defense counsel's failure to raise this argument on direct appeal was not ineffective assistance because *Gibson* had not yet been decided. *See Weingarten v. United States*, 865 F.3d 48, 53 (2d Cir. 2017) ("Counsel is not required to forecast changes in the governing law." (citation omitted)).

(quoting 18 U.S.C. § 3006A(a)(2)(B)).  In deciding whether to exercise its discretion to appoint counsel under the CJA, courts in this circuit consider the likelihood of success on the merits, the complexity of the legal issues and the movant's ability to investigate and present the case.  *See Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986).  Given the complexity of the legal issues here, the petitioner's motion for the appointment of counsel is granted.

## CONCLUSION

As explained above, the petition is dismissed without prejudice.  The petitioner is granted leave to amend his petition to address whether *United States v. Gibson*, 55 F.4th 153 (2d Cir. 2023) requires the Court to reconsider the application of the career offender enhancement.  The petitioner's motion for appointment of counsel is granted; counsel is to be appointed from the CJA habeas panel.  Appointed counsel has 60 days from this order to file an amended petition. The Clerk of Court is respectfully directed to terminate the pending petition and mail a copy of this order to the petitioner.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       July 12, 2023